SIGNED.

Dated: January 27, 2012

*James M. Marlar*

**James M. Marlar, Chief Bankruptcy Judge**
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF ARIZONA

In re:

KAUFMAN PEBBLE CREEK, LLC,

Debtor.

Chapter 11

No. 4:10-bk-32879-JMM

**MEMORANDUM DECISION**

On January 11, 2012, this court heard evidence concerning the fair market value of the Debtor entity's apartment complex. This hearing was necessary in order to establish value, for purposes of formulating a reorganization plan and assessing its feasibility in light of the valuation. 11 U.S.C. § 506.

This is an involuntary case, filed October 13, 2010, by a group of creditors. The real property at issue is a 107-unit apartment complex located at 7001 East Golf Links Road in Tucson, Arizona.

Evidence was presented by both the secured creditor, City National Bank, which holds a senior lien on the property of close to $10 million, and by the petitioning creditors. Each side obtained the assistance of competent and reputable appraisers, who testified as to their respective opinions of value, and the methods each used in coming to their ultimate conclusions.

The parties are familiar with the basic facts, and there is no controversy over what is being dealt with. In essence, the apartments are not even 50% occupied at present, and substantial work needs to be done to bring the property up to higher, and "stabilized"

occupancy levels. The complex was originally built in 1973, and was extensively remodeled in 2007-2008.

The complex sits in an area which has a plethora of other apartments, and thus is surrounded by competition for available renters.

Both appraisers are well-known to the court, and both have sterling reputations. Had the two conferred prior to the hearing, this court has no doubt that they could have arrived at a valuation figure that both could agree on.

For the creditor-proponents, Steven R. Cole's appraisal report (Ex. A) had an effective date of August 24, 2011, and he placed the value of the apartment complex at:

"As Is"     -     $3,600,000
Stabilized  -     $4,600,000

At the time of his appraisal, occupancy was at 46%.

Richard J. Kalinowski, Jr. testified for the secured creditor, City National. His effective valuation date was November 18, 2011, at which time the occupancy levels had decreased to around 35% (Ex. 1). Mr. Kalinowski's values were:

"As Is"     -     $5,610,000
Stabilized  -     $5,970,000

In their discussion about each appraisal, the attorneys prepared a helpful comparison chart of principal points, showing where each appraiser deviated. The chart showed that, except for a few areas--which areas affected their bottom line opinions--the appraisers were in fundamental agreement (Ex. 2). By narrowing the focus of the case in this way, the attorneys were able to more precisely discuss the reasons for the differences with the appraisers. This was of great assistance to the court.

The critical differences between the appraisers fall into only 3-4 categories:

- Expenses
    - Utilities
    - Personnel salaries and benefit
    - Contract services
- Capitalization rate
- Rent loss and "Developer's Profit" ("Entrepreneurial Incentive")
- Real estate taxes due

As between these narrow categories, each appraiser had cogent reasons for selecting the mathematical figures chosen. But in candor, each also acknowledged that some numbers were not precise, but that professional judgment had been exercised to attempt to reach the most probable conclusion.

For the court, unburdened by the subtleties of the real estate appraisal profession, the luxury of either choosing between competing appraisals, or attempting further analysis, is the art. Here, respect for the reputations of both appraisers, and their considered judgments, requires a court to attempt to do what it is confident the two appraisers might themselves have done, in a cloistered and collegial conference.

For a court, selection of the appropriate "cap rate," and application of a mathematical formula to accepted numbers, will divine the "value," to the extent it can be achieved without the intervention of the real world, i.e., an actual buyer and an actual seller.

But, that's the task, so we must begin. The mathematical formula, once the figures are established, is not difficult. It is:

Step 1: Net Operating Income (NOI) ÷ Cap Rate = "Stabilized Value

Step 2: Subtract from "Stabilized Value" various elements, such as rent loss during the "lease up" period (to get to, say, a 90% occupancy), other rehab expenses, etc.

Step 3: "Stabilized Value" minus Step 2 deductions = "As Is Value"

The art is in making sure that the NOI figure is as accurate as one can make it, <u>and</u> selecting an acceptable--and probable--cap rate.

## **EFFECTIVE GROSS INCOME**

Happily, both appraisers were extremely close on the income side of the equation:

        Cole:       $855,863

        Kalinowski: $853,099

For purposes of this analysis, the court will select the slightly lower Kalinowski figure.

## **EXPENSES**

### **Real Estate Taxes and Insurance**

This part of the analysis requires some intellectual juggling. In attempting to project real estate taxes and insurance, it was noted that each appraiser, using historical figures and then making educated guesses as to what the future would bring, came up with slightly different figures. The court has no difficulty with simply "splitting the difference" there, because exactitude is not possible. Thus, the court finds:

|  | Cole | Kalinowski | Court |
|---|---|---|---|
| Real Estate Taxes | $56,343 | $50,825 | <u>$53,584</u> |
| Insurance | $29,425 | $26,750 | <u>$28,087</u> |

## Administrative

The same arbitrary "analysis" applies to administrative expense:

|  | Cole | Kalinowski | Court |
|---|---|---|---|
| Administrative | $12,840 | $13,375 | $13,107 |

## Repairs and Maintenance

Each appraiser agreed that this figure was $58,850. The court will adopt it.

## Off-Site Management and Marketing

Again, the numbers were so close, that the "split adjustment" can be employed without doing substantial harm to the overall task:

|  | Cole | Kalinowski | Court |
|---|---|---|---|
| Off-Site Management | $29,955 | $34,124 | $32,039 |
| Marketing | $16,050 | $13,375 | $14,712 |

## Replacement Reserves

Because the appraisers' numbers were so close, these two can also be split:

|  | Cole | Kalinowski | Court |
|---|---|---|---|
| Replacement Reserves | $32,100 | $26,750 | $29,425 |

## Utilities

On this issue, the appraisers were a bit apart, with Mr. Cole at $96,300 and Mr. Kalinowki at $80,250. The difference is accounted for by the method. Mr. Cole used six months of historical data, and projected the other six, to arrive at his number. Mr. Kalinowski used 12 consecutive historical months.

In this category, the court favors the historical approach, and therefore adopts Mr. Kalinowski's figure of $80,250 for this category.

## Personnel Salaries and Benefits

Here, the appraisers were $32,100 apart, the difference being explained as either that more rentable units coming on-line requires more personnel (Mr. Cole), versus the point that efficiencies of scale allow a smaller number of workers to manage the complex's 107 units.

While it is certainly possible that the accurate number may lie somewhere in between, that exact point could, theoretically, be found at any given point on the scale, and not necessarily at the mid-point.

The court therefore favors Mr. Kalinowski's more conservative approach, and will adopt $85,600 as the figure for this category.

## Contract Services

Mr. Cole utilized a figure of $37,450 for these types of matters, such as landscaping, termite treatment, pool service and security.

Mr. Kalinowski gave no figure for this line item, nothing that he had included it within the "Repairs and Maintenance" category.

Since the court views repairs and maintenance as different than contract services, and since Messrs. Cole and Kalinowski used exactly the same number in the "Repairs and

Maintenance" category ($58,850), the court feels that Mr. Cole's views on this item were more persuasive.

Hence, for "Contract Services," the court will utilize the figure of $37,450.

## THE APPLICABLE CAPITALIZATION RATE ("CAP RATE")

The next area of opinion comes in attempting to determine the appropriate "cap rate" to apply to the NOI. The formula is:

$$NOI \div Cap\ Rate = Stabilized\ Market\ Value$$

The bottom line of this calculation is to determine the property's value, as if it were "stabilized." This is defined as having paying tenants with an occupancy rate of about 90%. That stability means, to the owner, that it can predictably count on income for the foreseeable future, having stabilized its income and expenses.

Cap rates are elusive. Judgment of each appraiser is critical in arriving at that number, because even slight variations can result in differences of thousands, or hundreds of thousands of dollars as to the market value of a property.

The cap rate measures risk to an investor. The higher the rate, the higher the risk. Thus, evaluating location, condition, other intangibles such as proximity to necessary services, crime and so forth, all contribute to this evaluation.

When attempting to determine cap rates, these appraisers looked at other sales, comparable in some, all, many, or indeed no ways to the subject property, and they then made calculated judgments as to what risk factors they felt contributed to the establishment of a cap rate for the subject property.

In Mr. Cole's analysis, he looked at three sales and one listing of other apartment complexes, made adjustments and determined their cap rates to be:

| Property | Cap Rate | Sold |
|---|---|---|
| Copper Hill Apartments, Tucson | 7.25% | 08/2011 |
| Casa Bella Apartments, Tucson | 7.43% | 08/2011 |
| Villa Antigua Apartments, Tucson | 8.08% | 04/2011 |
| Sherwood Gardens Apartments, Tucson | 7.27% | Listing |

Mr. Kalinowski used five comparable Tucson sales, and two sales from the Phoenix area, in his attempt to find an appropriate cap rate. For purposes of this opinion, the court will disregard Phoenix, due to the vast geographical and demographical differences between the two cities and their environs. In Tucson, Mr. Kalinowski looked at:

| Property | Cap Rate | Sold |
|---|---|---|
| Casa Bella Apartments, Tucson | 7.43% | 08/2011 |
| El Dorado Place, Tucson | 7.00% | 07/2011 |
| Villa Antigua Apartments, Tucson | 4.90%[1] | 04/2011 |
| Terra Vida, Tucson | 6.47% | 05/2010 |
| Retreat at Speedway, Tucson | 6.50% | 05/2010 |

From these reviews, each appraiser found the appropriate cap rate for the subject to be:

        Mr. Cole       8.00%
        Mr. Kalinowski  7.25%

From a review of all the evidence, and consideration for the methodology, the court feels that Mr. Cole's rate is too high, supported by only one sale, and Mr. Kalinowski's is too low, based on the return on investment expected from this particular property. In this current

---

[1] The court is baffled by the substantial difference between the two appraisers on this same property.

8

Case 4:10-bk-32879-BMW    Doc 85    Filed 01/27/12    Entered 01/27/12 12:25:49    Desc
Main Document - Chapter 11 Plan    Page 8 of 11

market, the court finds and concludes that a willing buyer would negotiate for a cap rate of 7.5%

This leads, then, to an opinion of stabilized value for the subject property to be:

$$\text{NOI } (\$419{,}995) \div 7.5\% = \$5{,}599{,}933$$

The court will round that figure to $5,600,000.

## DEDUCTIONS FROM STABILIZED VALUE

Each appraiser testified to his opinion of how long it would take to get all the currently unsuitable apartments repaired and on-line, generating revenue, and how much it would cost to get them there. Each included some component for "Developer's Profit" or "Entrepreneurial Incentive." Mr. Cole's "Developer's Profit" figure was simply 10% of the stabilized value. His other figures (rent loss and cost to complete) were more easily understood that Mr. Kalinowski's analysis (which wrapped a Developer's Profit within the rent loss figure, and did not break it out separately).

Therefore, on this piece of the puzzle, the court finds the appropriate numbers to be used are:

| | |
|---|---|
| Rent loss (9 months) | $ 126,921 |
| Cost to complete | $ 401,833 |
| Developer's Profit (10% of stabilized number of $5.6 million) | $ 560,000 |
| TOTAL | $1,088,754 |

Both sides conceded that, from this final figure, an additional amount would have to be subtracted in order to account for any unpaid real property taxes. Once the parties have established that figure with accuracy (and there should be no debate over it, since the County

9

Case 4:10-bk-32879-BMW   Doc 85   Filed 01/27/12   Entered 01/27/12 12:25:49   Desc
Main Document - Chapter 11 Plan    Page 9 of 11

Assessor will provide the "cure" number), then those taxes would be an additional deduction from the "as is" number.

## **CONCLUSION**

For § 506 valuation purposes, the court finds and concludes that the "as is" value of the subject 107-unit apartment complex is:

$4,511,246

Less: (Past Due Taxes)

The court's calculations are summarized in the attached Exhibit "A" to this Memorandum Decision. A separate order will be entered. FED. R. BANKR. P. 9021.

DATED AND SIGNED ABOVE.

COPIES to be sent by the Bankruptcy Noticing Center ("BNC") to the following:

Sally M. Darcy, Attorney for Petitioning Creditors
James B. Ball, Attorney for City National Bank
Office of the U.S. Trustee

# EXHIBIT "A"
## Court's Calculation of "As Is" Fair Market Value

| | |
|---|---:|
| **Effective Gross Income** | **853,099** |
| Expenses | |
| • Real Estate Taxes | 53,584 |
| • Insurance | 28,087 |
| • Utilities | 80,250 |
| • Administrative | 13,107 |
| • Repairs and Maintenance | 58,850 |
| • Personnel Salaries and Benefits | 85,600 |
| • Contract Services | 37,450 |
| • Off-Site Management | 32,039 |
| • Marketing | 14,712 |
| Subtotal (Expenses) | 403,679 |
| • Replacement Reserves | 29,425 |
| Total Expenses | 433,104 |
| • Per Unit | 4,047 |
| **Net Operating Income** | **419,995** |
| Overall Cap Rate | 7.5% |
| **Reconciled as if Stabilized Value** | **5,600,000** |
| Deductions from "As Is" Stabilized Value | |
| • Rent Loss | 126,921 |
| • Cost to Complete | 401,833 |
| • Developer's Profit | 560,000 |
| **Total Deductions** | **1,088,754** |
| **AS IS VALUE CONCLUSION** | **4,511,246** |
| **LESS: Past Due Real Property Taxes** | |